*1352·14*

ORIGINAL

IN THE TEXAS COURT OF

CRIMINAL APPEALS

AT AUSTIN, TEXAS

Cause No.  PD-1352-14

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 30 2014

Abel Acosta, Clerk

PETITION FOR DISCRETIONARY REVIEW

ALFREDO HOLGUIN, PETITIONER

v.

THE STATE OF TEXAS, RESPONDENT

FILED IN
COURT OF CRIMINAL APPEALS

DEC 31 2014

Abel Acosta, Clerk

FROM THE 8TH COURT OF APPEALS; CAUSE NO. 08-00253-CR; Aff'd 9.12.14;

FROM THE 243RD DISTRICT COURT OF EL PASO COUNTY, TEXAS

TRIAL CAUSE NO. 20120D01334 DECIDED 8.1.12;

Hon. Bill D. Hicks, Judge

X _____
Alfredo Holguin, Pro Se
TDCJ# 1809852 McConnell Unit
3001 S. Emily Dr.
Beeville, Texas 78102-8583
361.362.2300 (ph.)
361.362.3011 (fax)

# TABLE OF CONTENTS

IDENTITY OF PARTIES                                    ii

INDEX OF AUTHORITIES                                   iii

STATEMENT REGARDING ORAL AGRUMENT                      iv

STATEMENT OF THE CASE                                  iv

STATEMENT OF FACTS                                     iv

STATEMENT OF PROCEDURAL HISTORY                        1.

GROUNDS FOR REVIEW                                     1.

ARGUMENT                                               2.

PRAYER FOR RELIEF                                      13.

APPENDIX

DELARATION                                             v

CERTIFICATE OF SERVICE                                 v

## IDENTITY OF PARTIES

Alfredo Holquin, Petitioner Pro Se
TDCJ# 1809852 McConnell Unit
3001 S. Emily Dr.
Beeville, Texas 78102-8583
361.362.2300 (ph.)
361.362.3011 (fax)


El Paso County District Attorney
203 El Paso County Courthouse
500 E. San Antonio
El Paso, Texas 79901
915.546.2059 (ph.)
915.533.5520 (fax)


State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711-3046

INDEX OF AUTHORITIES

U.S. Constitution                    14th Amendment      iv

Texas Constitution                   Article 1§          iv

Texas Penal Code                     2.01                3.
                                     7.02                8.
                                     15.02               8.
                                     19.02               9.
Texas Code of Criminal Proc.         1.04                3.
                                     1.05                3.


Texas Cases

Allen 249 S.W.3d 680 (Tx. App.-Aus. 2008)               5.
Brooks 323 S.W.3d 893 (Tx. Crim. App. 2010)             6.
Ex Parte Adams 768 S.W.2d 281 (Tx. Crim. App. 1989)     12.
Ex Parte Bush 166 Tx. Cr. R. 259, 288 (1958)            13.
Ford 571 S.W.2d 924, 926 (Tx. Crim. App. 1978)          6.
Fraga 276 S.W.3d 55 (Tx. App.-ELP 2008)                 10.
Garrett 220 S.W.3d 926 (Tx. Crim. App. 2007)            2.
Gonzalez 296 S.W.3d @630                                 9.
Guevara 152 S.W.3d 45, 49 (Tx. Crim. App. 2004)         2.
King 594 S.W.2d 425 (Tx. Crim. App. 1980)               10.
Leal 303 S.W. 3d 292 (Tx. Crim. App. 2009)              2.
Reedy 214 S.W.3d 567 (Tx. App.-Aus. 2006)               6.
Ruiz 579 S.W.2d 206, 209 (Tx. Crim. App. 1979)          9.
Quitta 808 S.W.2d 636, 641 (Tx. App.-C.C. 1991)         10.


Federal Cases

696 F. Supp. 741 (S.D. Tex. 2010)                       7.
Burks 98 S.Ct. 2141 (1978)                              8.
Greene v. Massey 98 S.Ct. 2151 (1978)                   2.
Jackson 99 S.Ct. 2781 (1999)                            6.
Rosemund No. 12-895 (S.Ct.) Decided 3.5.14              9.
U.S. v. Gore 636 F.3d 728 (5th Cir. 2011)               2.
Haines v. Kerner 92 S.Ct. 549 (1972)                    13.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner does not seek oral argument.

## STATEMENT OF THE CASE

On September 20, 2005, Petitioner, Alfredo Holguin (hereinafter referred to as petitioner/Holguin), was indicted in cause no. 20050D04436 for the murder of Mark Anthony Cedillo, alleged to have occurred on or about October 6, 2002. (CR 3)[1] On March 8, 2012, the origional indictment was dismissed, and petitioner was reindicted in cause no. 20120D01334 for the capital murder of Mark Anthony Cedillo. (CR 69, 73). On August 1, 2012, a jury found petitioner guilty as charged. (4 RR 13; 6 RR 5). Petitioner was sentenced to life imprisonment. (6 RR 8). Petitioner filed notice of appeal on August 1, 2012, and a motion for new trial on August 3, 2012. (CR 152, 172). The trial Court's certification of Defendant's Right to appeal was filed on August 1, 2012. (CR 107) Petitioner appealed to the 8th Court of Appeals, and filed his brief on May 9, 2013. The 8th Court of Appeals affirmed the trial Court's judgment and rendered its opinion on September 12, 2014.

## STATEMENT OF THE FACTS

The facts of this case are that petitioner was convicted in violation of his constitutional protections. The State utilized impermissable presumptions, and a defective jury charge, in conjunction with faulty witness identification and hearsay testimony to obtain a conviction in conflict with his Due Process rights guaranteed by the U.S. Constitution and Texas Constitution.

fn.1 References to Clerk's Record are noted as CR then the document number. References to the Reporter's Record are noted as RR begining with the volume number RR followed by the corresponding page number.

STATEMENT OF PROCEDURAL HISTORY

Petitioner was indicted March 8, 2012 for Capital Murder. Petitioner proceeded to jury trial in the 243rd District Court of El Paso County, Texas on June 13, 2012 in Cause No. 20120D01334. Petitioner was found guilty on August 1, 2012. Petitioner filed notice of appeal on August 1, 2012 to the 8th Court of Appeals. The 8th COA Affirmend the trial court's decision on September 12, 2014.

Cause No. PD-1352-14

ALFREDO HOLGUIN,
            Petitioner Pro Se

v.

THE STATE OF TEXAS

§
§
§
§

IN THE SUPREME JUDICIAL
DISTRICT OF THE TEXAS
COURT OF CRIMINAL APPEALS
AT AUSTIN, TEXAS

PETITION FOR DISCRETIONARY REVIEW
PURSUANT TO TEX. R. APP. PROC. 68 et.seq.

TO THE HONORABLE JUSTICES OF THE COURT:

Now comes, Alfredo Holguin, Petitioner Pro Se, and presents this his petition for discretionary review, seeks relief for the various Constitutional infringements under due process and due course requirements of the United States and Texas constitutions. Herein, petitioner(Holguin) would respectfully show the Honorable Court the following:

I.

In reviewing the petitioner's cause, he humbly seeks the Court to take judical notice of the following facts:

1) State's "eyewitness" to a kidnapping failed/refused
   to positively identify petitioner (Holguin) as perpe-
   trator of any crime. (see 8th COA op., p. 7, fn. 8 & 9).
   in Appendix.

2) Benito Holguin (Benito)- Petitioner's cousin, was charged
   with the offense for which petitioner was on trial, however,
   never prosecuted in a court of law having jurisdiction.
   Benito died on August 17, 2009. Charges against Benito for
   the murder of Cedillo and previous murder were dismissed

1.

by the 346th Dist. Court on Januaury 28, 2010. (see Exhibit A & B in appendix).

3) Indictment before the jury a petitioner's trial on the merits fails to include any reference to Benito as co-actor or co-conspirator. (see indictment, exhibit C, as read to jury on July 30, 2012; 4 RR 12 - 13). Pursuant to the law of parties, Tx. Pen. Code 7.02, in the charge to the jury the Court permits the jury to find Holguin guilty based on the acts purportedly committed by Benito for which he never stood trial and the facts were never legally developed. (see jury charge, p. 4 in appendix, 5 RR 58-59). The jury charge permits the jury of the petitioner to find facts regarding the acts of Benito related to the death of Cedillo, can convict petitioner. However, neither the State nor the defense had the opportunity to impeach nor cross-examine Benito due to his death.

4) The State seeks to advance the testimony of Det. Pantoja to support the inconclusive testimony of Salcido whose statements the day of the crime are directly in conflict with trial testimony. A hearsay objection was reaised at trial. (see 4 RR 120-121); also (10.6.02. statement by Salcido teken by EPPD & 10.24.02 statement by Salcido taken by EPPD in appendix, exhibits F & G)).

## II.

Petitioner argues that as a Due Process requirement, the State must prove beyond a reasonable doubt each and every element of the alleged offense to obtain a conviction in the State of Texas and the United States. see U.S. v. Gore 636 F.3d 728 (5th Cir. 2011). Identity of the actor is a required element of a crime. see also Greene v. Massey 98 S.Ct. 2151 (1978); Guevara 152 S.W.3d 45, 49 (Tx. Crim. App. 2004). In the case at bar, the State in its case-in-chief creates an impermissable/mandatory presumption that Benito was responsible for the alleged kidnapping of Cedillo on October 6, 2002. The State is required to prove that Holguin was the actor. see Leal 303 S.W.3d 292 (Tx. Crim. App. 2009). It is undisputed that these presumptions are unconstitutional as they relieve the State of their burden of proving every element of the offense beyond a reasonable doubt. see Garrett 220 S.W.3d 926 (Tx. Crim. App. 2007). Here the State, via the law of parties, attempt to connect Holguin to Benito because of their

family relationship (cousins). The testimony before the fact finder is this: NO WITNESS IDENTIFIED HOLGUIN WITH ANY REASONABLE DEGREE OF CERTAINTY THAT HE WAS IN FACT THE ACTOR OR CO-ACTOR OF THE OFFENSE FOR WHICH HE WAS ON TRIAL. Evidence that Holguin's father's vehicle may have been used in the alleged offense without more creates an unfairly prejudicial presumption that Holguin was the driver. It is entirely reasonable that a vehicle is not always operated by its owner. Although the jury can disbelieve testimony of a witness, here, Det. Pantoja not Holguin testified that Holguin claimed the vehicle in question was stolen on 10.6.02 sometime posterior to his crossing into the United States. see Det. Pantoja's testimony (4 RR 126-129). It should be noted that the registration information on the mexican vehicle was improperly authenticated according to the Tex. R. of Evidence 902(3). Det. Pantoja merely commented that he could not find any records regarding the stolen vehicle (4 RR 129). That does not mean it was not true. Under cross-examination he reveales that he has little awareness of the mexican authorities policies/procedures regarding vehicles. (4 RR 143, 144). It must be remembered these are facts purported by the State's witnesses'. Which leaves the fact-finder in the position to dis believe the State's position regarding the facts. Irregardless of how the State attempts to muddy the waters, the required element of identity is unproven in the record, therefore, not before the fact-finder, rendering their resolution of the facts unreasonable. Reasonableness is the standard above which the State must exceed. If a reasonable determination <u>could</u> be made, then the State has not met its burden under the law. see Tx. Pen. Code 2.01; Tx. Code Crim. Proc. Art. 1.04, 1.05.

Here any connection infered by relationship, without more, is highly prejudicial and irrelevant. In no instance of any witness either prior to nor at trial can the State get more than a "likeness" identification of Holguin.

1. Det. Pantoja was not an eyewitness to a crime:

3.

2. Salcido on 10.6.02 describes the actor of the kidnapping as 26-27 y.o., 5'9", and about 190 lbs. with short black hair, mexican male.
The driver was described as a heavy set hispanic male possibly having long hair. Exhibit F in appendix.
There is no record of any identification made on 10.9.02.
On 10.24.02, in the 4th photo array in pos. no. 3, only strongly resembles the driver. Exhibit G in Appendix.
At trial some 10 years later testifies he has a vague recollection of photo arrays and dosen't remember much of anything else. (4 RR 28, 30, 35, 40, 42 -- cannot positively identify Holguin as driver):

3. Carrizal 10.6.02 makes an identification of a "bigger male" weighed about 250 lbs. (hispanic), and was taller than other which was about 5'10"-5'11".
At trial (4 RR 65) could not describe the "guys". And at (4 RR 68) dosen't remember any specifics; Exhibit H in appendix.

4. Herrera on 10.6.02 - Heavy set hispanic male, 5'11", about 250 lbs., black hair collar length, ends curled, had dark complexion, no facial hair noticed. This person was the driver;
At trial could only identify the driver as "heavier" than the passenger and seemed to be older. (4 RR 84). No other memory; Exhibit I in appendix.

5. Dominguez on 10.6.02 no description of actors, and at trial only testified as to description of vehicle. Exhibit J in appendix.

6. Villareal on 10.6.02, no description of actors, exhibit K in appendix, and at trial (4 RR 99) could only describe the hair of the driver as "...wavy, curly hair."

No other testimony by a State's witness went to, nor could establish beyond a reasonable doubt that Holguin was either the driver or some other participating actor/co-conspirator in the kidnapping/murder of Cedillo.

It is, however, reasonable that without any further degree of certainty that the above descriptions could apply to a vast number of the individuals in El Paso, Texas or Juarez, Chihuahua, Mexico. In Salcido's identification of Benito claiming he was actor to the kidnapping, gives no creedence to an inference that Holguin was the driver, thereby a co-actor. One might infer that because Holguin's vehicle was present he was present, however, it is also reasonable to infer that Benito had access to Holguin's vehicle. Holguin did

report the car stolen, this fact is not disproven. Holguin was at a baseball game in Juarez, this fact is not disproven. Tracking the State's position it would also hold true that an individual would be held responsible for say an act by a valet while unknowingly at some engagement, especially provided descriptions of the driver were somewhat similar or resembled the owner of the vehicle. Is that a possibility; sure. Is it proof beyond a reasonable doubt, far from it.

The relationship, even circumstantially, does not promote acts related to crime. Benito was never afforded due process regarding whether or not Salcido's allegations are true. The State bolsters its position regarding Benito's alleged acts on the fact he's deceased and cannot rebut the allegations. The State utilizes this to Holguin's detriment. Petitioner is further denied the opportunity to examine and/or impeach Benito and is therefore effectively denied his right to confront his accuser (by way of the law of parties), and cross-examine/impeach witnesses against him, a due process violation.

Foe these facts and reasons Holguin, petitioner Pro Se, respectively seeks resolution of this unresolved constitutional issue. De minimus the law requires review, de maximus, he is entitled to a reversal and acquittal.

### III.

Petitioner would argue that regarding whether the evidence was legally sufficient to support the verdict, the Court of Appeals although applying the proper standard of review, misapplied the facts to the law and/or legal precedence. In the Court's own opinion @ p. 7, states emphatically that the State's witness Salcido failed or declined to provide an identification of Holguin as the driver on 10.6.02, 10.24.02 or at trial. It is well known that a conviction cannot be had by stacking inference upon inference. see Allen 249 S.W.3d 680 (Tx. App.-Aus. 2008). Here, it is also well established that a jury may not reasonably infer an ultimate fact (identity) from meger circumstantial evide-

5.

nce that simply raises a number of inference, none more probable than another. see Reedy 214 S.W.3d 567 (Tx. App.-Aus. 2006).

Holguin argues that while the reported presence of his vehicle, albeit reported stolen, does not without more establish beyond a reasonable doubt he was the driver, which the State is slated to prove. Proof consisting of only strong suspicion or mere probability is insufficient under the Jackson 99 S.Ct. 2781 (1979); Brooks 323 S.W.3d 893 (Tx. Crim. App. 2010) standard; also Ford 571 S.W.2d 924, 926 (Tx. Crim. App. 1978). It is the logical force of the evidence, and not the number of links, that supports a fact-finder's verdict. Without some evidence to exclude equally reasonable hypothesis that Holguin was at a ball game in Mexico, and his car was stolen, the Court cannot conclude beyond a reasonable doubt that he was either actor or co-actor in the cause for which he was brought to trial. When the State's principal witness (Salcido) acknowledges it is possible another person could have been the driver, the State has not met its burden of excluding every other reasonable hypothesis except the guilt of Holguin. The fact that he was not in Texas after seeking his nephew to attend the celebratory day (Father's Birthday) with family, see (4 RR 126, 128), is fair minded within reason. Salcido never, between 10.6.02 up to and including trial (7.30.12), gives an idenctification more than "strongly resembles" [see EPPD witness statement, exhibit G in appendix, notarized by W. L. Lavender, Notary Public], whom he believes was driving the fleeing vehicle, also, he state many times over he did not get a good look. [see EPPD witness statement, exhibit F (the day of the offense), p. 2 "I couldn't see inside very well."

> 4 RR 28 "...I couldn't see [through] the windows."
>
> 4 RR 29 "I know they [the windows] were rolled up because I couldn't see inside because it was dirty."
>
> 4 RR 34 "Q:...are you later asked to go back to the EPPD to look at some photo line-ups?

6.

A:I don't remember..."

4 RR 35 Regarding photo arrays "...I don't remember
the people."
"Well that's my signature, but I can't remember."

4 RR 37 Regarding 10.24.02 statement "...I just can't
remember the person."
Reading from 10.24.02 statement, "The individual
in position no. 3 strongly resembles the guy that
was driving..."

4 RR 42 Regarding 10.24.02 statement/photo array, "Q: The
best you could do was say he strongly resembles the
guy that was driving...?
A: Yes, sir."

"Q: And now if I may show you that photo again.
Can you positively identify the person circled in
no. 3, my client, Alfredo Holguin, as the driver
of the vehicle?
A: No, sir."

The defense goes on to drive the point home, that Salcido, beyond a reasonable doubt could not identify Holguin [see also DNA report which excludes Holguin as having contact with Cedillo. Exhibit E in appendix], neither in the past nor present. None of the other State's witnesses were able to build upon that description with any reasonable degree of certainty to give any reasonable fact-finder enough facts to draw a reasonable conclusion that dispelled an equally reasonable hypothesis or disturb the facts that Holguin was at a ball game in Mexico or that his car was stolen. The judicial admissions here factually and legally prevent that State from obtaining a conviction.

To qualify as a judicial admission, a statement must be: 1) made in a judicial proceeding; 2) contrary to a fact essential to the theory of recovery; 3) deliberate, clear, and unequivocal; 4) such that giving it conclusive effect meets with public policy; and 5) about a fact on which a judgment for the opposing party can be based. see 696 F. Supp.2d 741 (S.D. Tex. 2010); also Tex. R. of Evidence Rule 201(although a jury is not required to accept a judicially noticed fact, they are not permitted to ignore it.). As previously shown, each

7.

of these five points are applicable to the case at bar. At trial the defense duly requested a directed verdict on this basis. (4 RR 182 & 5 RR 28) The trial Court erred in denying it. The Appellate Court misapplied the facts to the law and therefore denied petitioner due process. This is appropriately manifestly unjust. Holguin, Pro Se, seeks resolution of this issue. Based upon the fact application to law humbly requests reversal of his conviction and punishment pursuant to Greene 98 S.Ct. 2151 (1978) and Burks 98 S.Ct. 2141 (1978).

IV.

Petitioner argues that the trial Court reversibly erred when it permitted the inclusion of a lesser than beyond reasonable doubt standard in the charge to the jury. At trial defense counsel argued that the inclusion of the Tex. Pen. Code §7.02 (see objections to the charge of the court 5 RR 28-33). Further, counsel requested the inclusion of the definition of co-conspirator for the jury's consideration, clearly permitted by law. The facts of the case supported the jury should be required to determine whether or not Holguin was a co-conspirator by definition due to the wording of the law of parties, which at Tex. Pen. Code §7.02(b) clearly utilizes the word conspiracy and conspirators without clearly defining the terminology within the statute. Counsel sought, unsuccessfully, to have Tex. Pen. Code §15.02 "Criminal Conspiracy" included as guiding verbage for determination under the Tex. Pen. Code §7.02 language.

The 8th COA opined at p. 12-14 of their decision rendered 9.12.14, that they disagree that specific intent is required where evidence of a conspiracy advanced and murder should have been anticipated. And claims Holguin is incorrect in stateing the State is required to show such specific intent to kill Cedillo because the charge here is a result of conduct offense. Following statments by the Court claim Tx. Pen. Code §7.02(b) eliminates "any necessity" on the part of the State to prove the appropriate mens rea for the crime in which

8.

Holguin is charged by indictment and at trial for. citing Ruiz 579 S.W.2d 206, 209. (Tx. Crim. App. 1979); Gonzalez-296 S.W.3d @630.

Here, the indictment clearly tracks the language (para. A) of Tx. Pen. Code §19.02(b)(1); and (para. B) Id. sub. sec. (2). Therefore the defendant (Holguin) is notified by the election of the State that under the law they are required to prove the requisite intent. Without making any showing at trial of any conspiracy between petitioner and Benito, other than by facts not in evidence and effectively conjured by prosecutors that the acts were committed by Benito, does the leap to the law of parties become introduced during the charge to the jury. This set of circumstances is in direct conflict with U.S. Supreme Court precedence set forth in Rosemund No. 12-895, decided March 5, 2014, well before the appellate Court's decision. In Rosemund it is held similarly that where aiding and abetting, which is tantamount to Tx. Pen. Code §7.02, in addition to conduct extending to some part of the crime, the required intent extends to the whole crime. The Court went on to hold the trial Court's jury instructions were erroneous because they failed to require that Rosemund (here Holguin) knew in advance that one of his cohorts would be armed. In charging the jury to consider merely whether Rosemund (here Holguin) "knew his co-hort (here Benito, as alleged) used a firearm", the Court did not direct the jury to determine when Rosemund (here Holguin) obtained the requisite knowledge - i.e. to decide whether Rosemund (here Holguin) knew about the gun in sufficient time to withdraw from the crime. (vacated & remanded; 7-2 decision). see jury charge exhibit D in appendix.

Holguin's charge negates the requisite knowing/intent by a finding in the actions of Benito, who here was not on trial and unable to contest or rebut prosecutions insertions of conjecture regarding the facts alleged, due to being deceased. It is this Holguin argues denies his Due Process by permitting the jury to find him guilty on a lesser than beyond a reasonable doubt

9.

standard regarding his own intentional acts or lack thereof or knowing intent but those unadjudicated acts, with no factual support, of those of another. These varying wordings between indictment and jury charge further frustrate Holguin's notice under double jeopardy regarding his specific charges. see King 594 S.W.2d 425 (Tx. Crim. App. 1980).

It is for these unconstitutional deprivations that petitioner seeks review and relief. Holguin humbly requests this conviction and punishment be reversed and vacated.

V.

Holguin also forwards the colorable claim that his Due Process was violated when the prosecution inserted materially false conjecture that prejudicially affected the outcome of his trial. Throughout Holguin's trial, prosecutors insert material statements that are beyond their personal knowledge and outside the record. These manifestly improper statements especially those made in closing, over objection, are plain error of prosecutioral misconduct. The State is attempting to bolster its argument by injecting material statements regarding the unadjudicated alleged acts of Benito Holguin, Holguin's cousin, which are neither impeachable nor cross-examinable because they're made by the State itself, not a witness, nor a "co-conspirator" which is deceased.

The 8th COA claims in Fraga 276 S.W.3d 55 (Tx. App.-ELP 2008), that, Texas courts construe the "Dead man's Rule" narrowly, citing Quitta 808 S.W.2d 636, 641 (Tx. App.-C.C. 1991). Although this is typically applied in civil matters, Holguin argues it should be applied here. What the State is attempting is a mix between accomplice witness testimony and the dead man's rule. Holguin would show, however, the legal theory is equivalent in that both instances require corroborative evidence tending to relate the subject to the individual (i.e. [civil] independent statements or acts of the decedent tending

10.

to relate to an act; [crim.] evidence corroborating from an independent source which is challenged, tending to relate defendant to act for which he/she is on trial). In either instance, evidence need not be sufficient alone, but must tend to confirm and strengthen the testimony of the witness and show probability of its truth. The State does not have convincingly corroborative evidence or testimony of an independent source to confirm and strengthen Salcido's testimony, so, prosecutors seek to do that themselves. Here, defense counsel repeatedly objected, the statements constituted speculation, conjecture, it was assumed untrue facts or facts not in evidence and it was conclusory. It is undisputable these statements are self-serving for the State. It would be untrue for the prosecutors to claim these statements were of their personal knowledge, they were not eyewitnesses to the alleged acts of either Benito or Holguin. Here the State intends to intentionally transfer the allegations of Benito to Holguin of not only one but two unsolved murders where Benito was suspect. Because he is deceased the D.A. is hell bent on getting someone, claiming the mexicans, are "in for a penny, in for a pound." There are no underlying facts supporting any connection between Benito and Holguin on that day. Had the border crossing showed they were together, that would be one thing. But that is not before you, nor was it before the jury, although, that's what the State would have you believe.

It is far more believable that near the U.S./Mex. border that cars, if not license plates, are stolen regularly, especially for the purpose of masking the actors of crime whether Mexican or American initiated. Here, there are various descriptions of the suspect vehicle, everything from a Ford Taurus, Crown Vic.,Chevrolet Malibu, Mercury Grand Marquis, to an LTD. One witness, Ms. Herrera, was however, able to copy a plate no. and relate that to police via 911. This is in no way shape or form conformation of the identity of the driver. As it turns out as Det. Pantoja learned, the vehicle was reported stolen.

11.

As unconfirmed the State is hardly able to call it a lie. Nor does this provide any corroboration that Benito and Holguin were together, or that Holguin in any way conspired with Benito to perpetrate the acts alleged against Cedillo. Lacking any perceived or required corroboration the State induces its own conjecture and conclusory statements to bolster Salcido's "strongly resembles" and others bigger mexican descriptions, which in reality describe a significant demographic either Mexican (Juarez) or Mexiban/American (El Paso) populaion. Prosecutors statements include as example:

> 4 RR 17 "...officers...find evidence that points to ...Alferdo Holguin as culprits of this murder."

> 4 RR 18 "Benito Holguin being killed in the violence (drug) in Mexico."

> 4 RR 81 "you cannot just look at one--one piece of evidence, one statement made and say that you can't find somebody guilty of capital murder."

[Actually solitary statements, especially suppressed ones, can require an acquittal. see Ex Parte Adams 768 S.W.2d 281 (Tx. Crim. App. 1989)].

> "They committed this crime almost pretending or thinking that it was in Mexico,..."

> 4 RR 82 "..., to get people to come in, give statements, swear to them because when we're stuck in a situation--"

> 4 RR 84 "They give a general description that coincidently is dead on to the description of Alfredo Holguin..."

> 4 RR 86 "There's no doubt in my mind that its the same person who kidnapped Mark."

[Repeated remark & objection @ 4 RR 87]

> 4 RR 89 "They give a description of the car that matches the defendant's car dead on."

> 4 RR 91 "He's hiding in Mexico."

> 4 RR 93 "...Alfredo Holguin is guilty because he is the getaway driver. Multiple times. He is the getaway drive to the scene."

> "He is our getaway driver."

12.

...and so on. It is for these, as well as, other statements made throughout the trial, that due to their materiality and inability to be impeached does the State deny Due Process. There is no corroboration that Holguin is in fact an actor or co-actor nor that he is a conspirator which must be proven beyond a reasonable doubt, not by probability, speculation or conjecture, which is insufficient to sustain a conviction in Texas and United States under the Due process provision of the 14th Amendment of the U.S. Constitution. Petitioner seeks relief from this clear constitutional violation.

## Conclusion

If the trial Court convenes a hearing, elicits testimony and thereby develops facts, the Court of Criminal Appeals is not bound by the trial court's findings. The Court of Criminal Appeals is obligated to determine if the record developed supports the trial Court's conclusions. If it does not, the Court of Criminal Appeals may make a contrary finding. Here, any number of issues may have affected the trial outcome. The Court of Criminal Appeals has stated: "This Court has the power and authority to prevent enforcement of a judgment [of conviction] obtained under circumstances which constitute a denial of Due Process." Ex Parte Bush 166 Tx. Cr. R 259, 288 (1958). Petitioner has provided not only documentary evidence, but shown in the record the occurences referenced above. His burden has been carried. The State cannot deny petitioner's claims, which are founded in the law and on the facts derived in the record. Holgion seeks liberal construction pursuant to Haines v. Kerner 92 S.Ct. 549 (1972), as he is not trained in the art of law, nor is he a paralegal. Holguin seeks also protection of his rights and doing so presents these issues for review at _his_ first opportunity in due diligence.

## Prayer

Wherefore premises having been duly considered, Alfredo Holguin, Petitoner

13.

Pro Se, respectfully moves this Honorable Court of Criminal Appeals to consider and review his constitutional issues which violations there of contributed to his conviction. He further prays that he be Granted relief on each, some or all issues in the form of reversal and acquittal or de minimus new trial as there is a reasonable probability the confidence in the verdict was undermined. Further, petitioner humbly seeks this Court to grant all general relief to which he is legally entitled under either Texas or Federal Law.

Respectfully Submitted,

X Alfredo Holguin, Pet. Pro Se
TDCJ# 1809852 McConnell Unit
3001 S. Emily Dr.
Beeville, Texas 78102-8583
361.362.2300 (ph.)
361.362.3011 (fax)

14.

Appendix

(Documentary Evidence)


8th Court of Appeals Opinion   9.12.14

Indictment 9.20.05

Jury Charge   p.4

Benito Holguin Case Summary
20050DD4436; 99-12248


DNA Labratory Report 3.29.12



| | | |
|---|---|---|
| ALFREDO HOLGUIN, | § | No. 08-12-00253-CR |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 243rd District Court |
| | § | of El Paso County, Texas |
| THE STATE OF TEXAS, | § | (TC# 20120D01334) |
| Appellee. | § | |

## **O P I N I O N**

Alfredo Holguin appeals the trial court's judgment convicting him of capital murder and sentencing him to life imprisonment. In three issues, he complains of the sufficiency of the evidence, the admission of evidence, and the jury charge. We affirm.

## **FACTUAL AND PROCEDURAL BACKGROUND**

The murder victim in this case was Mark Anthony Cedillo. On October 6, 2002, he was taken at gunpoint and forced into the backseat of a brown, four-door sedan displaying Mexican license plates. Cedillo's former uncle by marriage, Jesus Salcido, witnessed the kidnapping. A few minutes later, witnesses driving in the vicinity saw the sedan in a nearby parking lot and two Hispanic men, one larger than the other, assault Cedillo, who crumpled to the ground bleeding. When the men drove away, the witnesses, some of whom had heard gunshots, returned to the

parking lot to attend to Cedillo, who eventually died at the scene from two gunshot wounds to his neck. After talking to Salcido and the other witnesses, law enforcement officers, including former El Paso Police Detective Jesus Pantoja developed Benito Holguin and Appellant as suspects.[1]

Three days after Cedillo's death, Pantoja went to his funeral and showed Salcido photo lineups containing Benito's and Appellant's photographs. Although years later he would not remember having spoken to Pantoja at the funeral, Salcido identified Benito and Appellant from the lineups shown to him that day. Approximately two weeks later, Salcido was shown eight photo lineups—each containing six photographs—at the police station and asked if he recognized any of the individuals in them. Two of the lineups contained Benito's and Appellant's photographs. Again, Salcido identified Benito as the kidnapper and Appellant as the driver. Although Salcido was confident in his identification of Benito, he was not as confident in his identification of Appellant, commenting that "[Appellant] . . . strongly resembles the guy that was driving the brown four-door car."

Appellant was arrested approximately nine years later[2] and charged with capital murder. Before trial, he moved to suppress the identification evidence on the basis that the identification procedure was impermissibly suggestive. The trial court held an evidentiary hearing, during which the State called Pantoja as its only witness.

Pantoja testified that Salcido was shown eight photo lineups, two of which contained photographs of Benito and Appellant, respectively; that the photographs in the lineups were obtained from DPS; and that each lineup depicted Hispanic males with similar characteristics,

---

[1] Benito was Appellant's cousin. He died sometime before Appellant was tried.

[2] Appellant was residing in Juarez, Mexico during the intervening years.

2

including size and build, hair color, facial hair, and clothing. Pantoja further testified he asked Salcido to look through the lineups to see if he recognized anyone. According to Pantoja, he did not tell Salcido which photographs to select or that the lineups contained photographs of the suspected perpetrators. Pantoja testified Salcido selected photographs of Benito and Appellant from the lineups; identified them as the kidnapper and driver, respectively; and circled, dated, and signed the two photographs. On cross-examination, Pantoja acknowledged that photographs of Benito and Appellant had been provided to the media sometime before Salcido identified them from the lineups[3]; however, Pantoja maintained that he did not know if Salcido had seen the photographs distributed to the media and that he never spoke to Salcido about the matter before showing him the lineups.

Defense counsel argued Salcido's identification of Appellant was unreliable because it was tainted by the distribution of Appellant's photograph to the media. The prosecutor countered:

> [O]n the photo lineup, there was mention of whether or not there were photos flashed across the media. I don't think that Detective Pantoja was specific enough about what information was released to the media. And as far as the photo lineup, that is the Defendant's burden on this case. And there was no other information volunteered or given or presented to the Court today as far as this issue was concerned. I believe that Mr. Pantoja said I think at some point there was some sort of media attention to this, but there were no specifics as far as what was flashed and the contents of it. And if you will remember the testimony from Mr. Pantoja, when Mr. Salcedo, the eyewitness, who is right there with the Defendant when this car pulls up and these two individuals kidnapped him, he's very specific. Not only does he say he recognizes these two individuals, he's very specific as to the role each one played. He's saying Alfredo Holguin was the driver of the vehicle and Benito Holguin was the guy who had him at gunpoint and put him in the car. So I don't believe that there was enough information brought to this court to suggest that this photo lineup should be suppressed or that it was tainted by some sort of media release since there wasn't even a media release presented to the Court today to show how it could taint the lineup. Other than that, I think the lineups speak for themselves. They are not suggestive. Mr. Pantoja says he doesn't suggest to Mr. Salcedo, the witness, who to identify and so we believe, on both of these issues, we

---

[3] At trial, Pantoja testified the two photographs were published in the El Paso Times on October 12, 2002.

3

provided enough information to the Court that you should deny the motion to suppress . . . .

Agreeing that "there was no evidence elicited specifically regarding any possible taint from media exposure" and that "mere speculation" was insufficient to sustain Appellant's burden, the trial court denied the motion to suppress.

At trial, Salcido testified about his out-of-court identification of Appellant and the circumstances attending it. During his testimony, Salcido had difficulty recalling specific details concerning the kidnapping and his out-of-court identification of Appellant. Although Salcido could not remember selecting Benito and Appellant's photographs from the lineups shown to him at the police station, after reviewing his statement, he confirmed that he circled, signed, and dated the two photographs. The State sought the admission of the lineups into evidence, and the trial court admitted them without objection. On cross-examination, Salcido admitted he could not positively identify Appellant as the driver. The State did not ask any of its other witnesses to identify Appellant. During closing arguments, defense counsel argued the State had failed to prove beyond a reasonable doubt that Appellant was the driver.

The jury charge authorized the jury to convict Appellant as a principal actor or as a party to the offense under either Sections 7.02(a)(2)—aider and abettor—or 7.02(b)—coconspirator—of the Texas Penal Code.[4] Appellant objected to the inclusion of Section 7.02(b), arguing it was a

---

[4] The application paragraph of the trial court's charge instructed the jury as follows:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 6th day of October, 2002, in El Paso County, State of Texas that ALFREDO HOLGUIN, did then and there intentionally cause the death of MARK ANTHONY CEDILLO by shooting him with a firearm, and ALFREDO HOLGUIN was in the course of committing or attempting to commit the offense of kidnapping; OR if you find from the evidence beyond a reasonable doubt that Benito Holguin intentionally caused the death of MARK ANTHONY CEDILLO by shooting him with firearm [sic] and Benito Holguin was then and there in course [sic] of committing or attempting to commit the offense of kidnapping, and you further find beyond a reasonable doubt that ALFREDO HOLGUIN,

4

separate theory of liability the submission of which was not supported by the evidence and permitted the jury to convict him of capital murder without having to find he had:

> [T]he specific intent to kill which we would suggest is violative of Texas law, and the State's burden of proof under the Fourteenth Amendment due process clause in Article 1, Section 9 and 19 of the due course of law clause. Basically the State is being able to lessen their burden of proof by using this conspiracy discussion, and there's a huge difference between capital murder and straight murder under Texas law.

The trial court overruled Appellant's objections[5], and the jury found him guilty.[6]

## ADMISSION OF IDENTIFICATION EVIDENCE

In his first issue, Appellant asserts the trial court should have excluded all of the identification evidence because it was obtained by a pretrial identification procedure so impermissibly suggestive as to have led to a substantial likelihood of misidentification. Specifically, he challenges the admission of the photo lineups, Salcido's in-court identification of him, and Pantoja's "testimony regarding Salcido's alleged identifications." We disagree that the trial court abused its discretion by admitting this evidence.[7]

---

acting with intent to promote or assist the commission of the offense, encouraged, directed, aided, or attempted to aid Benito Holguin in the commission of said offense; OR if you find from the evidence beyond a reasonable doubt that Benito Holguin intentionally caused the death of MARK ANTHONY CEDILLO by shooting him with a firearm and Benito Holguin was then and there in the course of committing or attempting to commit the offense of kidnapping, and you further find beyond a reasonable doubt that acting with intent to promote or assist the commission of the offense of kidnapping, ALFREDO HOLGUIN encouraged, solicited, directed, aided or attempted to aid Benito Holguin in the commission or attempted commission of the said kidnapping, if any, and that the shooting of MARK ANTHONY CEDILLO, if there was such, was done in furtherance of the conspiracy to kidnap MARK ANTHONY CEDILLO, if any, and was an offense that should have been anticipated as a result of carrying out the conspiracy, then you will find the Defendant guilty of CAPITAL MURDER as charged in the Indictment. (Verdict Form A)

[5] Holguin also requested that the trial court define the term "conspiracy" for the jury, but the trial court denied his request. Holguin does not complain of this ruling on appeal.

[6] Appellant moved for a new trial, but his motion was overruled by operation of law.

[7] We review a trial court's decision to admit evidence for an abuse of discretion. *Smith v. State*, 683 S.W.2d 393, 404 (Tex.Crim.App. 1984).

5

## 1. Admissibility of Pretrial Photo Lineup

Citing *Cantu v. State*, 738 S.W.2d 249 (Tex.Crim.App. 1987), Appellant argues the photo lineup was impermissibly suggestive because his photograph was shown to Salcido on two separate occasions, first at Cedillo's funeral and then at the police station approximately two weeks later. In *Cantu*, the court acknowledged that showing the victim four photo lineups, three of which contained the appellant's photograph, over a four month span was suggestive, but rejected the appellant's contention that the suggestive procedures tainted the victim's in-court identification so as to create a substantial likelihood of irreparable misidentification. *Id.* at 251-52. Although *Cantu* may be helpful to Appellant, we need not reach the merits of his complaint because he failed to preserve it for appellate review.

When a pretrial motion to suppress evidence is overruled, the defendant need not subsequently object to the admission of the same evidence at trial in order to preserve error, but if the defendant affirmatively states that he has "no objection" to the evidence, he waives any error in its admission. *Holmes v. State*, 248 S.W.3d 194, 200 (Tex.Crim.App. 2008). Here, the State sought the admission of the pretrial photo lineups at trial. When the trial court asked if Appellant had any objections to their admission, defense counsel responded, "No objection, Your Honor." By affirmatively stating at trial that he had no objections to the admission of the evidence in issue, Appellant waived and failed to preserve his right to contest the admission of the evidence on appeal on the grounds raised in his motion to suppress. *See Holmes*, 248 S.W.3d at 200; *Swain v. State*, 181 S.W.3d 359, 368 (Tex.Crim.App. 2005); *Moody v. State*, 827 S.W.2d 875, 889 (Tex.Crim.App. 1992).

## 2. In-Court Identification

6

Next, Appellant contends Salcido's in-court identification of him should not have been admitted because it too was the result of impermissibly suggestive pretrial procedures. However, Salcido was not asked to make, and did not make, an in-court identification of Appellant, and Appellant does not cite to any portion of the record showing otherwise.[8] Nor are we able to find factual support in the record for Appellant's contention.[9] To the contrary, the record establishes Salcido testified about his out-of-court identification of Appellant and the circumstances attending it. Accordingly, Appellant has failed to demonstrate Salcido made an in-court identification of him tainted by impermissible suggestive pretrial procedures. *See Williams v. State*, 402 S.W.3d 425, 431-32 (Tex.App.--Houston [14th Dist.] 2013, pet. ref'd)(noting witness was not asked to identify appellant at trial and rejecting appellant's contention that witness's reference to him as "the defendant" constituted an in-court identification of him).

### 3. Testimony Regarding Photo Lineup Identification

Finally, Appellant asserts his constitutional right to confront Salcido was violated when Pantoja testified to Salcido's out-of-court identification of him at Cedillo's funeral because Salcido's memory loss prevented him from effectively questioning Salcido about that matter. Under these facts, Appellant's Sixth Amendment right to confront Salcido was not implicated by Pantoja's testimony.

To implicate the Confrontation Clause of the Sixth Amendment, an out-of-court statement

---

[8] Pantoja was the only witness asked to identify Appellant at trial.

[9] In his brief, Appellant proclaims:

> As for Salcido's in-court identification, Salcido emphatically denied being able to identify Appellant. In fact, the record clearly conveys Salcido's reluctance to own up to the resemblance notation. 'That's my signature, but I can't remember.'

Notwithstanding that Appellant fails to cite to the record in support of his contention, the snippet of Salcido's testimony on which he relies to make his point relates to Salcido's out-of-court identification of him.

7

must be testimonial in nature and *have been made by a declarant absent from trial*. *Crawford v. Washington*, 541 U.S. 36, 50-52, 59, 124 S.Ct. 1354, 1363-65, 1369, 158 L.Ed.2d 177 (2004); *Woodall v. State*, 336 S.W.3d 634, 641-42 (Tex.Crim.App. 2011)(rejecting appellant's argument that witness's memory loss made her absent for purposes of the Confrontation Clause). Here, Salcido testified at trial and was subject to cross-examination regarding the extrajudicial statement about which Appellant complains. Indeed, Salcido was asked about his statement when cross-examined by defense counsel. Simply because Salcido did not provide the answers to Appellant's satisfaction does not mean he was denied the right to confront him. This is because "'the *Confrontation Clause* guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Woodall*, 336 S.W.3d at 643, *quoting Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). [Emphasis in original]. Thus, as long as the defendant is given the fair and full opportunity "'to probe and expose [forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony[,]'" the right guaranteed by the Confrontation Clause has been satisfied. *Id.*, quoting *Fensterer*, 474 U.S. at 22, 106 S.Ct. at 295. In this case, Appellant was afforded that opportunity.

Appellant's first issue is overruled.

## SUFFICIENCY OF THE EVIDENCE

In his second issue, Appellant argues the evidence was insufficient to support the jury's finding that he was the perpetrator. We disagree.

### *Standard of Review*

8

The legal sufficiency standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), is the only standard a reviewing court applies in determining whether the evidence is sufficient to support a conviction. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). When reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89.

Under a legal sufficiency review, we may not substitute our judgment for that of the jurors, who are the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). We therefore defer to the jurors' resolution of these issues and to their responsibility to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13, *citing Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89. In resolving what the facts are and what reasonable inferences may be drawn from them, the jurors may accept one version of the facts and reject another, and they may reject any part of a witness's testimony, even if uncontradicted. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000), *overruled on other grounds*, *Laster v. State*, 275 S.W.3d 512 (Tex.Crim.App. 2009); *Henderson v. State*, 29 S.W.3d 616, 623 (Tex.App.--Houston [1st Dist.] 2000, pet. ref'd).

### Applicable Law

The State bears the burden of proving that the accused is the person who committed the

9

charged offense. *See Phillips v. State*, 164 Tex.Crim. 78, 297 S.W.2d 134, 135 (Tex.Crim.App. 1957). The identity of the accused may be proved by direct evidence, circumstantial evidence, or even inferences. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex.Crim.App. 1986); *Martin v. State*, 246 S.W.3d 246, 261 (Tex.App.--Houston [14th Dist.] 2007, no pet.); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex.App.--Austin 2000, pet. ref'd). Proving the identity of the accused in open court, although the preferred procedure, is not required if other evidence establishes the accused's culpability. *See Conyers v. State*, 864 S.W.2d 739, 740 (Tex.App.--Houston [14th Dist.] 1993, pet. ref'd). Further, the absence of an in-court identification is merely a factor for the jury to consider in assessing the weight and credibility of the witnesses' testimony; it is not outcome-determinative in and of itself. *See Meeks v. State*, 897 S.W.2d 950, 954-55 (Tex.App.--Fort Worth 1995, no pet.).

### *Discussion*

When viewed in the light most favorable to the verdict, the evidence adduced at trial was sufficient for the jury to reasonably conclude that Holguin was the perpetrator. Salcido identified Appellant as the driver in two separate photographic lineups, and the lineup in which Appellant's photograph was circled, signed, and dated was admitted into evidence at trial without objection. Further, Appellant was connected with the crime through other evidence. He admitted to Pantoja that he drove the sedan identified by the witnesses into the United States approximately two hours before Cedillo's murder. Although Appellant claimed that he drove back into Mexico shortly thereafter and that the sedan was stolen later that day, Pantoja testified he was unable to find any records verifying Appellant's claim, and records obtained from the Department of Homeland Security established that the sedan crossed the border only once that day. And the witnesses'

10

description of the driver matched Appellant's physical stature and appearance.

Appellant asserts evidence that he resembled the driver does not constitute proof beyond a reasonable doubt given that Salcido's memory was faulty and no other witness identified him as the driver. However, "[t]he fact that a witness cannot give a positive identification of another person goes to the weight of his testimony, not to its admissibility; therefore, the lack of a positive identification is a jury issue." *Livingston v. State*, 739 S.W.2d 311, 329 (Tex.Crim.App. 1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). In this case, after listening to Salcido's testimony, the jury was within its exclusive province to accept that testimony at face value or to disregard part or all of it as warranted under the circumstances. *See Margraves*, 34 S.W.3d at 919. By finding Appellant guilty, the jury necessarily chose to believe Salcido's testimony, and in conducting our legal sufficiency review, we are prohibited from re-evaluating the weight and credibility of Salcido's testimony or substituting our judgment for that of the jury. *See Williams*, 235 S.W.3d at 750.

Appellant's second issue is overruled.

## CHARGE ERROR

In his third issue, Appellant contends the charge was erroneous in two respects.[10] First, because it impermissibly permitted the jury to convict him of capital murder as a coconspirator under Section 7.02(b) of the Penal Code without requiring the State to prove that he had the specific intent to kill Cedillo. Second, because it did not require that the jurors agree unanimously "on which subsection of 7.02 was applicable . . . ."

---

[10] We review charge error on appeal by determining whether error occurred, and if so, whether that error caused sufficient harm to require reversal. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex.Crim.App. 2005). The degree of harm required for reversal depends on whether the defendant preserved error at trial. *Id.* at 743. If he did, the record must establish only "some harm" to obtain reversal; if he did not, the record must demonstrate "egregious harm." *Id.* at 743-44.

11

*Specific Intent to Kill*

Appellant's first complaint concerns the inclusion of Section 7.02(b) in the jury charge. Appellant does not dispute that the law of parties, including the theory of party responsibility set forth in Section 7.02(b)[11], applies to capital murder. *See Johnson v. State*, 853 S.W.2d 527, 534 (Tex.Crim.App. 1992), *cert. denied*, 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993)("This Court has continually held that the law of parties announced in §§ 7.01 and 7.02 is applicable to capital murder cases."); *Gonzalez v. State*, 296 S.W.3d 620, 629 (Tex.App.--El Paso 2009, pet. ref'd)("The law of parties, as set out in Texas Penal Code § 7.02(b), may be applied in a capital murder case."); *Frank v. State*, 183 S.W.3d 63, 72 (Tex.App.--Fort Worth 2005, pet. ref'd)("The law of parties applies to the offense of capital murder . . . ."). He does, however, dispute the applicability of Section 7.02(b) here. Appellant asserts Section 7.02(b) applies "only in [capital murder] cases where a showing was made of specific intent, or where evidence of a conspiracy was advanced and the murder should have been anticipated."[12] We disagree.

Appellant contends that, although Section 7.02(b) does not itself require a finding of intentional conduct, the State was nonetheless required to prove he possessed the specific intent to kill Cedillo because capital murder is a "result of conduct" offense. He is incorrect. Section 7.02(b) eliminates any necessity on the part of the State to prove Appellant possessed the specific

---

[11] Section 7.02(b) states:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b)(West 2011).

[12] Appellant asserts "there was no evidence advanced that the kidnapping was conspired over, nor was it shown that the murder should have been anticipated in carrying out the conspiracy to commit kidnapping." He does not argue that the evidence was insufficient to support his conviction based on a theory of party liability generally.

12

intent to kill Cedillo. *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex.Crim.App. 1979); Gonzalez, 296 S.W.3d at 630. To convict a person of capital murder as a coconspirator under Section 7.02(b), the State need only prove that the person had both the *mens rea* to engage in the conspiracy and the culpable mental state to commit the underlying, *i.e.*, the intended, felony. *Gonzalez*, 296 S.W.3d at 630, quotation marks and internal citations omitted. The State is not required to prove that the person had the intent to commit the actual felony perpetrated by a co-conspirator because the mental state for the underlying felony supplies the *mens rea* for the actual felony. *Id.*, quotation marks and internal citations omitted.

To support his contention that the State was required to prove he had the specific intent to kill Cedillo, Appellant relies on *English v. State*, 592 S.W.2d 949 (Tex.Crim.App. 1980). He argues *English* requires a trial court to instruct the jury in all capital murder cases in which Section 7.02(b) is applied that, in order to convict, it must find the defendant intended to kill under each theory stated in the charge, including the theory of party responsibility set forth in Section 7.02(b). Appellant reads *English* too broadly.

In *English*, the appellant was convicted of capital murder. 592 S.W.2d at 950. The charge authorized the jury to convict him as the primary actor or as a coconspirator under Section 7.02(b). *Id.* at 952-54. "In accordance with the language of Section 7.02(b)," the trial court instructed the jury that, in order to convict, it must find the appellant and his co-conspirators were engaged in the commission of a robbery or attempted robbery and he or another co-conspirator intended to kill the victim. *Id.* at 954. The trial court's charge did not authorize the jury to convict the appellant if it found that the murder was committed during the course of a conspiracy to rob the victim, but instead required the jury to find that the appellant was a party to the offense

13

of capital murder. *English*, 592 S.W.2d at 950.

On appeal, the appellant argued the charge impermissibly allowed the jury to convict him of capital murder if it found he committed the murder during the course of a conspiracy to commit robbery, rather than finding he committed an intentional murder in the course of a robbery or attempted robbery. *Id.* at 952. The court disagreed, concluding Section 7.02(b) is applicable to capital murder cases and the jury was properly charged. *Id.* at 955. In remarking on the charge in question, the court noted that the trial court, "in a commendable act of caution," cautioned the jury it could not convict the appellant unless it found beyond a reasonable doubt, under each theory contained in the charge, he had specific intent that the victim be killed. *Id.* at 954-55. According to the court, this cautionary instruction "insured that the jury would not be confused by the conspiracy language the court used in applying the law to the facts." *Id.* at 955. However, this observation was not the basis for the court's decision and therefore cannot be read as requiring cautionary or restrictive instruction in all cases in which Section 7.02(b) is applied.

Appellant has not shown that the trial court erred in including Section 7.02(b) in the jury charge.

### Jury Unanimity

Appellant's second complaint concerns the absence in the charge of a requirement that the jury unanimously decide under which theory of party liability—aider and abettor under Section 7.02(a)(2)[13] or coconspirator under Section 7.02(b)—he was culpable. He "argues that the

---

[13] Section 7.02(a)(2) establishes party liability as follows:

> A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . .

TEX. PENAL CODE ANN. § 7.02(a)(2)(West 2011).

14

failure to require all twelve jurors to agree on which theory of party liability applied to [him] violated the United States and Texas Constitutions and the Texas Penal Code." We disagree.

"Jury unanimity is required on the essential elements of the offense but is generally not required on the alternate modes or means of commission." *Leza v. State*, 351 S.W.3d 344, 356 (Tex.Crim.App. 2011); *accord Pizzo v. State*, 235 S.W.3d 711, 714 (Tex.Crim.App. 2007)(unanimous verdict helps ensure each juror is convinced beyond reasonable doubt that prosecution proved each essential element of offense); *Ngo v. State*, 175 S.W.3d 738, 745 (Tex.Crim.App. 2005)("Under our state constitution, jury unanimity is required in felony cases, and, under our state statutes, unanimity is required in all criminal cases."). The provisions of Section 7.02, which defines party liability, do not contain elements of the underlying offense, but rather "describe alternative manners by which an accused may be held accountable for the conduct of another who has committed the constituent elements of a criminal offense . . . ." *Leza*, 351 S.W.3d at 357. Thus, if the jury determines that the accused is guilty of every constituent element of the criminal offense charged—"*either* as a principal actor *or* under some theory of party liability"—the jury is not required to unanimously determine what his "precise role" was in the offense. *Id.* [Emphasis in the original].

Here, the Appellant was charged with one offense—the capital murder of Cedillo—under three alternate theories of criminal culpability, two of which were based on Section 7.02. The jury charge required unanimity regarding Appellant's culpability for the capital murder of Cedillo, but did not require unanimity as to the manner in which he was culpable—as a principal or as a party. "Leza makes it clear that multiple theories of party liability under section 7.02 may be listed disjunctively in the jury charge without running afoul of the constitutional unanimity

15

requirement." *Sanchez v. State*, No. 03-13-00050-CR, 2013 WL 4487562, *6 (Tex.App.--Austin Aug. 15, 2013, pet. ref'd)(mem. op., not designated for publication). This is "because the theories are not conceptually distinct; rather, they are slightly different characterizations that can be given the appellant's particular conduct, each of which would make him guilty of the sole crime charged." *Id.* Accordingly, the jury in this case was not required to unanimously agree on the theory of criminal culpability supporting their unanimous conclusion of Appellant's guilt as either a principal or party for a single offense.

Appellant "argues that because 7.02 contains two sections with differing *mens rea* requirements, he was entitled to unanimity as to which of the two different underlying intent theories the jury found from the evidence." Appellant, however, fails to acknowledge, let alone distinguish *Leza*. Instead, he directs our attention to *Kitchens v. State*, 823 S.W.2d 256 (Tex.Crim.App. 1991) and *Aguirre v. State*, 732 S.W.2d 320 (Tex.Crim.App. [Panel Op.] 1987)(op. on reh'g). Upon close review, these cases actually provide additional support for our conclusion. Both *Kitchens* and *Aguirre* stand for the proposition that there is no requirement under a general charge that the jurors designate which of the alternative means of committing the offense they found to have been proven. *See Kitchens*, 823 S.W.2d at 258; *Aguirre*, 732 S.W.2d at 326.

Appellant has not shown that the trial court erred in failing to require the jury to unanimously determine what his exact party accountability might be.

Appellant's third issue is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

16

September 12, 2014

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J. (Not Participating)

(Do Not Publish)

The State of Texas vs Benito Felix Holguin

§
§
§
§
§

Case Type: **Adult Felony**
Date Filed: **09/20/2005**
Location: **346th District Court**

---

**RELATED CASE INFORMATION**

---

**Related Cases**
   20050D04436 (Related Case)
   05-06740 (Related Case)

---

**PARTY INFORMATION**

---

**Lead Attorneys**

**Defendant**    HOLGUIN, BENITO FELIX

**State**    **State of Texas**    **DENISE BUTTERWORTH**
915-546-2059(W)

---

**EVENTS & ORDERS OF THE COURT**

---

**DISPOSITIONS**

01/28/2010 | **Disposition** (Judicial Officer: Barill, Angie Juarez)
      1. MURDER
            Dismissed

01/28/2010 | **Sentenced - Other** (Judicial Officer: Barill, Angie Juarez)
      1. MURDER
            Comment (Comment: THE SAID DEFENDANT DIED ON 08/17/2009 Sentence Date: Jan 28 2010 12:00AM )

**OTHER EVENTS AND HEARINGS**

09/20/2005 | **Other**
09/20/2005 | **Indictment (OCA)**
01/28/2010 | **Motion/ Order to Dismiss**
01/20/2011 | **Precept Return**

Documentary Evidence Appendix Exhibit A

# REGISTER OF ACTIONS
## CASE No. 990D02689

| The State of Texas vs Benito Felix Holguin | § | Case Type: | **Adult Felony** |
|---|---|---|---|
| | § | Date Filed: | **06/24/1999** |
| | § | Location: | **346th District Court** |
| | § | | |
| | § | | |

---

### RELATED CASE INFORMATION

**Related Cases**
99-12248 (Related Case)

---

### PARTY INFORMATION

**Lead Attorneys**

**Defendant**    HOLGUIN, BENITO FELIX

**State**    **State of Texas**

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

01/28/2010 | **Disposition (Judicial Officer: Barill, Angie Juarez)**
     1. MURDER INTENTIONALLY CAUSE DEATH
         Dismissed

**OTHER EVENTS AND HEARINGS**

06/24/1999 | **Other**
06/24/1999 | **Indictment (OCA)**
     Vol./Book 1384, Page 1366
07/31/2001 | **Hearing (8:00 AM) (Judicial Officer Barill, Angie Juarez)**
01/22/2002 | **Subpoena Issued**
01/30/2002 | **Subpoena Issued**
01/28/2010 | **Motion/ Order to Dismiss**
01/20/2011 | **Precept to Serve**

Documentary Evidence Appendix Exhibit B

**INDICTMENT**

FILE NO.: 02-279195 _____ PID/CONTRL NO. 1132696/05-06741 _____

## STATE OF TEXAS

## VS.

## ALFREDO HOLGUIN

**OFFENSE:** **MURDER**

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

The Grand Jurors for the County of El Paso, State of Texas, duly organized as such, at the ____**JULY**____ Term, A.D., 2005 of the ____**120th**____ Judicial District Court for said County, upon their oaths in said Court, present that on or about the *6th day of October, 2002* and anterior to the presentment of this indictment, in the County of El Paso and State of Texas, *ALFREDO HOLGUIN*, **hereinafter referred to as Defendant,**

**PARAGRAPH A**
did then and there intentionally and knowingly cause the death of an individual, namely, **MARK ANTHONY CEDILLO** by **shooting MARK ANTHONY CEDILLO with a firearm,**
And it is further presented that the said Defendant used and exhibited a deadly weapon, to-wit: a firearm, during the commission of and immediate flight from said offense,

**PARAGRAPH B**
did then and there, with intent to cause serious bodily injury to an individual, namely, **MARK ANTHONY CEDILLO**, commit an act clearly dangerous to human life, to wit: **shooting MARK ANTHONY CEDILLO with a firearm,** that caused the death of the said **MARK ANTHONY CEDILLO,**
And it is further presented that the said Defendant used and exhibited a deadly weapon, to-wit: **a firearm,** during the commission of and immediate flight from said offense,

### AGAINST THE PEACE AND DIGNITY OF THE STATE.

_____
Grand Jury Foreperson

FILED THE ____SEP 2 0 2005____ BY _____ DEPUTY

THE STATE OF TEXAS
COUNTY OF EL PASO

I certify that the foregoing is a true and correct copy of the original Indictment on file in my office. Given under my hand and seal of the court at my office in El Paso, Texas on the ____SEP 2 0 2005____.

**GILBERT SANCHEZ, District Clerk, El Paso County, Texas**

BAIL AMOUNT: $250,000 by _____ Deputy

The Defendant, ALFREDO HOLGUIN, stands charged by Indictment with CAPITAL MURDER, alleged to have occurred on or about the 6th day of October 2002. To these charges the Defendant has pleaded not guilty.

Now if you find from the evidence beyond a reasonable doubt that on or about the 6th day of October, 2002, in El Paso County, State of Texas that ALFREDO HOLGUIN, did then and there intentionally cause the death of MARK ANTHONY CEDILLO by shooting him with a firearm, and ALFREDO HOLGUIN was in the course of committing or attempting to commit the offense of kidnapping; OR if you find from the evidence beyond a reasonable doubt that Benito Holguin intentionally caused the death of MARK ANTHONY CEDILLO by shooting him with firearm and Benito Holguin was then and there in course of committing or attempting to commit the offense of kidnapping, and you further find beyond a reasonable doubt that ALFREDO HOLGUIN, acting with intent to promote or assist the commission of the offense, encouraged, directed, aided, or attempted to aid Benito Holguin in the commission of said offense; OR if you find from the evidence beyond a reasonable doubt that Benito Holguin intentionally caused the death of MARK ANTHONY CEDILLO by shooting him with a firearm and Benito Holguin was then and there in the course of committing or attempting to commit the offense of kidnapping, and you further find beyond a reasonable doubt that acting with intent to promote or assist the commission of the offense of kidnapping, ALFREDO HOLGUIN encouraged, solicited, directed, aided, or attempted to aid Benito Holguin in the commission or attempted commission of the said kidnapping, if any, and that the shooting of MARK ANTHONY CEDILLO, if there was such, was done in furtherance of the conspiracy to kidnap MARK ANTHONY CEDILLO, if any, and was an offense that should have been anticipated as a result of carrying out the conspiracy, then you will find the Defendant guilty of CAPITAL MURDER as charged in the Indictment. (Verdict Form A)

Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will next consider whether or not the Defendant, either acting alone or with others as a party as that term has been defined, intentionally or knowingly unlawfully restrained MARK ANTHONY CEDILLO as a lesser included offense of the offense of Capital Murder, as charged in the Indictment. If you find the Defendant not guilty of Capital Murder, but guilty of the lesser included offense of UNLAWFUL RESTRAINT then you will so indicate in Verdict Form B.

Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will acquit the Defendant, ALFREDO HOLGUIN, of CAPITAL MURDER, as charged in the indictment and the lesser included offense of UNLAWFUL RESTRAINT. (Verdict Form C)

## MANNER OF DELIBERATIONS

a.  In order to return a verdict, each juror must agree thereto.

b.  Jurors have a duty to consult with one another to deliberate with a view of reaching an agreement, if it can be done without abrogating individual judgement.

4



# TEXAS DEPARTMENT OF PUBLIC SAFETY

CRIME LABORATORY
11612 Scott Simpson
El Paso, TX 79936
Voice 915-849-4120 Fax 915-849-4113
ElPasoCrimeLab@dps.texas.gov



STEVEN C. MCCRAW
DIRECTOR
DAVID G. BAKER
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
ALLAN B. POLUNSKY, CHAIR
ADA BROWN
JOHN STEEN
CARIN MARCY BARTH
A. CYNTHIA LEON

## DNA Laboratory Report

Issue Date: March 29, 2012

David Samaniego
El Paso Police Department
911 N. Raynor
El Paso, TX 79903

**Laboratory #** L4E-41048
**Agency #** 02-279195
**County** El Paso
**Offense Date** 10/06/2002

**Suspect(s):** Holguin, Alfredo (DOB 07/07/74)
Holguin, Benito (DOB 12/14/70)
**Victim(s):** Cedillo, Mark (DOB 12/20/79)

**Requested Analysis:** Perform Forensic DNA Analysis
**Submission Information:**

2 a properly sealed large white file box on January 30, 2012 by Det. Samaniego

**Evidence Description, Results of Analysis and Interpretation:**

Portions of the items were extracted by a method that yields DNA.

The extracted DNA was subjected to the Polymerase Chain Reaction (PCR) and examined at the following STR loci: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, Amelogenin, D5S818, and FGA.

### 3-01 - Swab from left fingernail clippings (Item 1)

The partial DNA profile from the swab of the left fingernail clippings is consistent with the DNA profile of Mr. Cedillo. Mr. Cedillo cannot be excluded as the contributor of the profile at the following loci: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D5S818, and FGA. At these loci, the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 4.975 quadrillion for Caucasians, 1 in 185.7 quadrillion for Blacks, and 1 in 981.4 trillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Cedillo is the source of this profile (excluding identical twins).

### 3-02 - Swab from right fingernail clippings (item 2)

The DNA profile from swab of the right fingernail clippings is consistent with a mixture. Mr. Cedillo cannot be excluded as the contributor of the major component in this profile. The probability of selecting an unrelated person at random who could be the source of the major component in this profile is approximately 1 in 11.89 quintillion for Caucasians, 1 in 898.5 quintillion for Blacks, and 1 in 3.209 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Cedillo is the source of the major component in this profile (excluding identical twins). Mr. Alfredo Holguin is excluded as a contributor to the major component in this profile. Due to the low level of data, no DNA comparisons will be made to the minor component.

### 3-03 - Known blood sample from the victim (item 3)

The DNA profile was used for comparison purposes.

### 3-04 - Stain from victim's blue jeans (item 4)

**Laboratory Case Number**

L4E-41048

**Agency Case Number**

02-279195

**Offense Date**

10/06/2002

The DNA profile from the stain from the blue jeans is consistent with the DNA profile of Mr. Cedillo. Mr. Cedillo cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 11.89 quintillion for Caucasians, 1 in 898.5 quintillion for Blacks, and 1 in 3.209 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Cedillo is the source of this profile (excluding identical twins).

### 3-05 - Stain from victim's red t-shirt (item 5)

The DNA profile from the stain from the red t-shirt is consistent with the DNA profile of Mr. Cedillo. Mr. Cedillo cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 11.89 quintillion for Caucasians, 1 in 898.5 quintillion for Blacks, and 1 in 3.209 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Cedillo is the source of this profile (excluding identical twins).

### 3-06 - Stain from victim's left tennis shoe (item 6)

The DNA profile from the stain from the left tennis shoe is consistent with the DNA profile of Mr. Cedillo. Mr. Cedillo cannot be excluded as the contributor of the profile. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 11.89 quintillion for Caucasians, 1 in 898.5 quintillion for Blacks, and 1 in 3.209 quintillion for Hispanics. To a reasonable degree of scientific certainty, Mr. Cedillo is the source of this profile (excluding identical twins).

### 3-07 - Right buccal swabs from Alfredo Holguin (item 9A)

The DNA profile was used for comparison purposes.

**Investigative Leads:**

Please refer to a previous report issued on November 12, 2011 (under case number L4E-35059) by Joseph Correa, two additional reports issued on November 22, 2002 by Joseph Correa, and one issued on February 16, 2012 by Nicolas Ronquillo.

A DNA profile obtained from Mr. Alfredo Holguin has been entered into the Combined DNA Index System (CODIS).

Hair and fiber analysis may be warranted in this case. For more information about Trace evidence analysis and how it may aid in the investigation, please contact the DPS Lubbock lab at 806-472-2871.

**Disposition:**

The swabbings from the left fingernail clippings, right fingernail clippings, blue jeans, red t-shirt, and tennis shoe were depleted during DNA analysis. The other previously collected items and the resulting DNA extracts have been retained to preserve biological constituents. We are unable to retain the bulk evidence in our vault. Please make arrangements to pick it up at your earliest convenience.

This report has been electronically prepared and approved by:

Nicolas Ronquillo
Forensic Scientist III
Texas DPS El Paso Crime Laboratory

Appendix

(Witness Statements)

Jesus Salcido 10.6.02

Jesus Salcido  10.24.02

Eduardo Carrizal 10.6.02

Wendy Herrera 10.6.02

Eduardo Dominguez 10.6.02

Susana Villareal 10.6.02

*Testimonio Testigo*
*Clave*
*10/06/02*

## EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

Offense: DEATH UNATTENDED
Complainant:
Address:

This statement was given voluntarily to: DET. R. POSADA #1403
Of the El Paso Police Department by: JESUS ENRIQUE SALCIDO
Social Security: _____
Address: _____
D.O.B.: _____
Home Phone Number: _____
Work Phone Number: _____
Driver's License:
Date & Time: 10-06-02        9:15 PM
====================================================

My name is Jesus Enrique Salcido and I live at '                 . with
my son Orlando and I have lived there for about 5 years. I am
currently employed with Southwest Staffing, 1600 Lee Trevino and I have
been employed there for the last 2 years. I am currently at the Crimes
Against Persons office speaking to Det. Posada about my nephew, Mark.
I was married to Mark's (sister) Sylvia Martinez for about 10 years. I
have been divorced from her for about 11 years. We had two sons and
one girl together. My son Jessie is 18 years old, Orlando is 17 years
old, and my daughter Vanessa is 13 years old. Sylvia is sister to
Mark's mother, Maria. I don't know Mark's last name. My girlfriend
Kristen Vasquez lives with me right now until she gets another
apartment.

At about 5:00 PM on today's date, I was going to my job at 6900 Lee
Trevino to drop off my time card. I was driving my 1981 Harley
Davidson FLH north on Lee Trevino and I was near the El Paso Honda when
my nephew Mark drove up to my left side. He was driving a white
Chevrolet Silverado, extended cab with chrome wheels. It looked like a
new truck. I told him to pull over into the parking lot next to the
Taco Bell. I then let Mark pull in front of me into the parking lot of
the Taco Bell. I followed him in my motorcycle. As I was turning, I
heard a car honk. I looked through my mirror and noticed a car behind
me. I think the whole front end of the car was white and it also
pulled into the parking lot. I then parked behind the Taco Bell and
in front of Mavericks. I parked my motorcycle facing the Mavericks
billiards. Mark parked his truck behind the Taco Bell facing south
towards the rear entrance of El Paso Honda. As soon as Mark parked his
truck he got off and started walking towards me. I was parked north of
his truck. As he got to where I was, he told me that I had a nice
bike. I then heard someone say, 'HEY COME HERE'. I then looked and I
saw a guy walking towards Mark. The guy was a hispance male, 26-27
years old, 5'9', about 190 pounds, black short hair combed back,
buttoned up shirt with a collar with short sleeves-yellow-orange in

1

# EL PASO POLICE DEPARTMENT

# WITNESS STATEMENT

**Case#: 02-279195**

color, and the pants were faded jeans or gray pants. He was wearing
black casual black shoes.

The guy walked up to Mark and grabbed him with his left hand. He told
Mark, 'VENTE, ME DEVES'. The guy had his right hand under his shirt on
his waistband. As soon as he grabbed Mark by the arm, I took a step
towards them. The guy looked at me and then uncovered his right hand
and he held a black automatic handgun by his right side. The gun was
dark gray and it looked like a 9mm but not as long. He never pointed
the gun at me or at Mark. The guy then walked Mark back to a car that
was parked behind the Taco Bell facing towards Mavericks billiards.
The car was at an angle a few parking spaces north of where my
motorcycle was. I noticed that this was the same car that followed me
into the parking lot after it had honked.

The guy then walked Mark by his left arm to the rear passenger seat.
He made Mark get in the rear seat and then he got into the rear seat
besides Mark. I saw a heavy set Hispanic male seating in the driver
seat of the car. It kind of looked like he had long hair but I am not
sure. Once Mark was put in the car, the car left towards Lee Trevino
in between the Taco Bell and Chilis.
I remember that the number 296 were part of the plates on the car. The
car had orange Chihuahua plates. The car looked like a Chevrolet
Malibu with 4 doors. The car was about a 1978 to a 1982. It had a
darker brown top and bottom of the car was a faded brown. The front
end was white. I noticed that the front passenger window was rolled
down about 6 inches but the rear passenger window was rolled up to the
top. The windows were filthy and I couldn't see inside very well.

I had a cell phone with me at the time but I didn't call the police. I
wanted to go to Mark's mothers house and ask his mother if she knew
what was going on. I saw that the car got to Lee Trevino in the
parking lot and this is when I drove my motorcycle north in the parking
lot and onto Vista Del Sol. I drove to Mark's mother's house at 11973
Manuel Acosta.

When I arrived at Maria's house (Mark's mother), her daughter told me
that she was asleep. I told her to wake her up. When she woke up I
told her that some guys had taken Mark at gun point. She then told me
that she had received threats and that someone was looking for Mark.
She told me that they had told her not to call police, but I told her
to call 911. I waited until police arrived. Maria told me that she
had run Mark out of the house because he was into drugs.

The last time I saw Mark was about 2 months ago when he came over to my
house to visit my son, Jessie. That was right before Jessie went into
the Army. He wanted Jessie to go out with him to meet some girls.
Jessie did not go with him. Before this day, I hadn't seen Mark since
about 5 months. About 1 year ago, Mark came over to the house on his

2

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

motorcycle. I think he had a Ninja motorcycle. We went to Rods and Wheels and drank some beers.
I did not hang out with Mark, that was the only time that I went partying with Mark. I have never met any of Mark's friends.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED AUTHORITY.
ON THIS DATE 6TH DAY OF 2002.

WITNESSES:

3

*Testimonio* *Testigo Clave*

10/24/02

# EL PASO POLICE DEPARTMENT
## WITNESS STATEMENT/Case#: 02-279195

Offense: Capital Murder
Complainant: Mark Anthony Cedillo
Address: 11973 Manuel Acosta

This statement was given voluntarily to: Det. J.Pantoja Jr. #854
Of the El Paso Police Department by: Jesus Enrique Salcido
Social Security:
Address:
D.O.B.:
Home Phone Number:
Cellular Number:
Work Phone Number:
Driver's License: Texas DL#
Date & Time: 10-24-02/1007HRS
=================================================================

My name is Jesus Enrique Salcido and I am 38 years old. I am
presently in the Crimes Against Persons Office of the El Paso
Police Department and I am freely and voluntarily providing this
second witness statement to Detective Pantoja.
Today I agreed to meet with Detective Pantoja in the Crimes
Against Persons Office for the purpose of viewing several photo
line-ups. Prior to viewing the given photo line-ups, Detective
Pantoja advised me on the following. I would be viewing several
color and black and white photo line-ups of Hispanic males. I
would then be asked to view the photo line-ups and see if I could
identify the individuals involved in the given case. There was a
total of eight photo line-ups that I would be viewing. Detective
Pantoja further advised me that the individuals involved in the
given case might be or might not be in the given photo line-ups
and I was not obligated to identify anyone. I began viewing the
photo line-ups and in the first photo line-up, I did not
recognize anyone. I did not recognize anyone in the second photo
line-up. I did not recognize anyone in the third photo line-up.
In the fourth photo line-up the individual in position #3
strongly resembles the guy that was driving the brown 4-door car
that Mark was forced into. Detective Pantoja had me circle the
individual's photograph and then I dated, timed and signed the
photo line-up. I then viewed the fifth photo line-up and I was
able to immediately identify the individual in position #2 as the
person who kidnapped Mark at gunpoint. There is no doubt in my
mind that he is the same person who kidnapped Mark. The only
difference is that he is slimmer. Detective Pantoja had me circle
the individual's photograph and then I dated, timed and signed
the photo line-up. I remember meeting with Det. Posada at Mark's
funeral and he showed me several photographs one of which was
this same guy. I had told Detective Posada that he was the guy
that had kidnapped Mark the only difference was that he was now

slimmer than in the photograph. I once again saw this guy's photograph in the El Paso Times. I did not recognize anyone in the sixth photo line-up. I did not recognize anyone in the seventh photo line-up. I did not recognize anyone in the eight photo line-up. I have advised Detective Pantoja that I had never met the two guys that I identified before. I have advised Detective Pantoja that I will assist the State of Texas in it's prosecution.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_____
Jesús Enrique Salcido

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED AUTHORITY. ON THIS DATE 24th DAY OF OCTOBER, 2002.

NOTARY PUBLIC STATE OF TEXAS — WALTER L. LAVENDER — My commission expires 04-03-2004

2

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

Offense: DEATH UNATTENDED
Complainant:
Address:

This statement was given voluntarily to: DET. R. POSADA #1403
Of the El Paso Police Department by: EDUARDO CARRIZAL
Social Security: ·
Address: _____  X., 79853
D.O.B.:
Home Phone Number:
Work Phone Number:
Driver's License:
Date & Time: 10-05-02        8:00 PM

My name is Eduardo Carrizal and I live at                   ,          Texas
and I have lived there for the past 2 years.  I am currently self-
employed and I have been so for the last couple of years.
I am at the Crimes Against Persons speaking to Det. Posada about the
incident that I saw at 1491 Lee Trevino.

At about 5:00 PM on today's date, I was driving with my wife, Wendy
Herrera northbound on Lee Trevino.  I was driving a 1996 Ford Contour,
plum in color that belongs to my wife.  I had both my sons with me;
they are 2 and 7 years old.  When I was driving on Lee Trevino, I was
right in front of El Paso Honda when my wife told me to look over
across the street from the Honda store because some guys were fighting.
I looked over to where the fight was and I saw that a bigger Hispanic
male had another male in a headlock.  Another Hispanic male was kicking
the male that was in a headlock.  The bigger male weighed about 250
pounds and he was taller than the other male.  He was wearing a white
t-shirt.  The male that was kicking was wearing a red shirt, he was
thinner and was about 5'10' or 5'11'.  I could tell that both those
guys were beating up the other male.  I saw that a Grand Marquis,
vinyl dark brown top with a carmel color bottom was parked facing south
next to where the males were beating the other male.  The males were
fighting near the driver side of the car.  The car was parked in the
parking lot of some businesses.

As I came up to a turn around on Lee Trevino, I honked my horn.  I
then turned around to go south on Lee Trevino when I saw that both
males got into the Grand Marquis and drove southbound on Lee Trevino.
The bigger male was driving the car and the other one sat in the front
passenger seat.  I noticed that the male was beat up stayed on the
ground.  I followed the car down Lee Trevino as my wife call 911.

The car then stopped at the red light at Lee Trevino and Pelicano where
I stopped behind him.  The car had yellow Chihuahua plates on it and my
wife wrote them down.  The car looked like a 1986 model and it had the

1

# EL PASO POLICE DEPARTMENT

# WITNESS STATEMENT

Case#: 02-279195

Grand Marquis design in between both rear lights. She also told the operator at 911 what the plates were. We were in the far right lane while at the red light. The car then moved over to the center lane. I noticed that the driver was looking back at us through the mirror. He knew that I was following him. When the car changed lanes, I turned west on Pelicano and then turned north on the first street. That street took me right to Armour where I turned east. Armour was just north of where the male was laying on the ground. I drove up next to the male, and parked right where the Grand Marquis had been. My wife and me got off the car and went to look at the male. My wife was still on the phone with 911 and they told her to check and see if the male had a pulse. I could tell that he was already dead. The male was a Hispanic, 22-24 years old, black hair with a small tail. He was wearing a long sleeved shirt and blue jeans. He was wearing his left white tennis shoe and he was missing his right shoe. He had blood on his nose, mouth and on the ground behind his head. He was facing up. He was lying with his head facing north and I noticed a shell casing next to him on his right side. When police arrived, I told them about the casing.

When the fire department showed up, I moved my car a little south in the parking lot. Later, the police told me to move it behind the building where we were. I called my sister, Irma Adams to pick up my two sons. I was asked to go to 911 North Raynor to give a witness statement to police.

When I followed the Grand Marquis down Lee Trevino, I noticed that a black four-door car had stopped on Armour next to the male on the ground. When we came back to check on the male, the other witness was there who was driving the black car.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED AUTHORITY. ON THIS DATE 6TH DAY OF OCTOBER 2002.

WITNESSES:

_____

_____

WALTER LAVENDER

My commission expires 04-03-2004

2

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

WITNESSES:

A.E. Reyes #497

I1512

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195
Offense: Capital Murder
Complainant: Mark Anthony Cedillo
Address: 11973 Miguel Acosta

This statement was given voluntarily to: Det. Samaniego #1512
Of the El Paso Police Department by: Wendy Hererra
Social Security: _____
Address: _____            Tx. 79853
D.O.B.:
Home Phone Number: _____
Work Phone Number: _____
Driver's License:
Date & Time: 10/6/02 at 8:00pm
======================================================================

My name is Wendy Herrera and I am 28 years of age. I have lived in the El Paso area all my life. I am currently attending El Paso Community College. I am at 911 N Raynor giving this statement to Det. Samaniego about an incident that happened earlier today.

At about 4:59pm, my husband Eddie Carrizal and I were driving north on Lee Trevino. I saw some guy being beat up by two guys. They were fighting in front of a shopping center right by Armour St. My husband who was driving our car honked at the guys. One guy had the victim in a headlock and he was punching him to the face. While the one guy was punching him the other guy got out of the backseat passenger side of the car and he began to kick the victim to his body. We had passed the victim and I was looking back from inside the car as all this was happening. My husband then turned made a U-turn by the Taco Bell and as we were driving south we saw the guy that had him in a headlock throw the victim to the floor. The two guys then jumped into the car and peeled out. AS they drove off it happened that we were right behind them. We were in the far right lane at this time. The car then moved to the center lane as we approached Pellicano. As they were in front of us I was writing down the license plate to the vehicle. I then called 911 while I was at the stoplights and I gave them the plate to the vehicle. I wrote the license plate on a West Texas Credit Union receipt. We stayed at the red light for about 30 seconds. The light turned green and we turned right. I had asked 911 if we should follow them and they told us no. This is when we turned right on Pellicano. We then went back to where the victim was being assaulted and noticed a lot of blood to his nose, mouth and mostly to the back of his neck. I touched him and called out to him but he did not respond. I lifted up his shirt touching his chest to see if he was breathing or a

1

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

pulse. The victim was not breathing and I did not feel his heart beating. The fire department then arrived and we stayed until the officers arrived.

I could best describe the guy that had the victim in a headlock as a heavy-set Hispanic male. He was about 511 and he weighed about 250. His hair was black and about collar length. The ends of his hair curled up. He had a dark complexion and I did not notice any facial hair. He was wearing a white T-shirt and I was unable to see his pants because of how he had the victim. This person was the driver of the car.

The other guy that got out from the back seat was a little taller and slim. He had short dark hair and he had a medium skin complexion. I only noticed that he was wearing a black T-shirt.

I did not get to see their faces real good so I couldn't tell how old they were. The vehicle they got into was a dark faded chocolate brown large square car. It had 4 doors and the license was a yellow Fronterizo Chihuahua Plate. The characters I wrote down were 296SEF3. I also told the dispatcher, as I was looking at the plate the characters.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

*Yllindy Herrera*

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED AUTHORITY. ON THIS DATE 6th DAY OF October 2002.

WITNESSES:

_____

_____

WALTER L. LAVENDER
NOTARY PUBLIC STATE OF TEXAS
My commission expires 04-03-2004

2

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

Offense: Capital Murder
Complainant:
Address:

This statement was given voluntarily to: Det. Ray Sanchez #1457
Of the El Paso Police Department by: Eduardo Dominguez
Social Security: _____
Address: _____
D.O.B.: _____
Home Phone Number: _____
Driver's License: _____
Date & Time: 10/06/02 2015 hrs.
=================================================================

My name is Eduardo Dominguez, I am presently at the El Paso Police
Department, Crimes Against Persons office. I am speaking with Det.
Sanchez about what I saw this afternoon.

On Sunday, October 06, 2002, my wife, our kids and I were at the
Camelot USA on Lee Trevino around 5 pm. As we were leaving, I drove
onto Lee Trevino, when I heard a backfire. I thought it was a car so
I continued into the turning lane at Armour street. At this time, I
heard another backfire. As I was about to make a u-turn at that
intersection, I saw a body falling to the ground and another person
getting into a car in the parking lot at Lee Trevino and Armour. When
I saw this, I decided to turn into Armour street. I got onto Armour
street and continued past the parking lot where this was happening. I
saw a two tone car, dark over tan, possibly an LTD or a Crown
Victoria. I saw that the license plate was yellow with dark letters.
I turned into the parking lot through the second entrance on Armour
street and made my way back to the area, where the body was. The
first thing I noticed was that the back of the guys neck was bleeding
excessively. I also saw a bullet casing on the ground about two feet
away from the body. I tried talking to him and noticed that the guy
could not talk. My wife called 911 and told the operator that the guy
was dying. My wife gave me the phone and I talked to the 911 operator
and I gave her some information about the guy. At this time, other
people starting showing up and gathering around the body. My wife and
another lady did touch the body as they were looking for a pulse. A
man walked up to us and identified himself as a retired federal agent
and had all of us move away so that we would not contaminate the crime
scene. He said we had a DOA. I noticed that the guy on the ground,

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

was missing a shoe. I also saw a chain with a pendant on the ground about two feet from his feet, opposite the side of the casing. The Police then started showing up, so I stepped aside, and told one of the officers that I was a witness.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

*Eduardo Domin___*

SUBSCRIBED AND SWORN TO BEFORE ME., THE UNDERSIGNED AUTHORITY.
ON THIS DATE  DAY OF October 1902.

WITNESSES:

#1512

Det. R. _____ #1403

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195
Offense: Capital Murder
Complainant: Michael Anthony Cedillo
Address:

This statement was given voluntarily to: Det. Samaniego #1512
Of the El Paso Police Department by: Susana Villareal
Social Security:
Address:            t
D.O.B.:
Home Phone Number: 852-0514
Work Phone Number: 533-8393
Driver's License:            3
Date & Time: 10/6/02 at 9:00pm
==============================================================

My name is Susana Villareal and I am 32 years old. I have lived in El Paso for about 9 years. I am currently employed by A&A Consultants. I have been there for seven years. I am at 911 N Raynor giving Det. Samaniego this statement about an incident that happened earlier today.

At about 4:56pm my husband Eduardo Dominguez and I were driving out of Camelot Car lot located on Lee Trevino. As we got onto Lee Trevino going northbound I heard two gunshots. The first gunshot was not as loud as the second gunshot. We then got onto Lee Trevino and as we were going to make a U-turn to go south I saw across the street a group of guys. I then saw one guy fall to the floor. These guys were in a parking lot to a shopping strip. My husband then told me that he was going to drive into the parking lot but I told him not to because I didn't know what was going on. I saw that there was a car next to the guy that fell to the floor. My husband who was driving went west on Armour Street. He then turned into the back of the shopping strip and went back to where the guy had fell. As we approached we saw that the car that was right next to the guy that fell took off in a hurry. I did not see how many guys got into the car. As the car took off we drove up to the guy that fell to the floor. I noticed that something was wrong with the guy on the floor because he did not move. I then called 911 as we were approaching him. I told the operator to send an ambulance because a boy had been shot. I told her the location to where we were. I got real nervous and I gave the phone to my husband. Another couple came up and she was also on the phone with the operator. She was giving me instructions on what to do. I pulled up the guy's shirt to see if he was breathing and I did not see his chest rise so I knew that he wasn't breathing. An older man in a van pulled up and he told us to get away from him.

1

# EL PASO POLICE DEPARTMENT

## WITNESS STATEMENT

Case#: 02-279195

Shortly after this a fire department showed up. I could not tell where he was bleeding from but as he was lying on the floor there was a lot of blood underneath his neck. He was lying face up when I arrived.

The only thing that I was able to see was the car that took off real fast. It was an older car, it had four doors and it looked like a Crown Victoria. It was beige in color and it was faded. The portion of the car near the window was lighter and it looked worn out.

I HAVE READ THIS STATEMENT AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS, I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED AUTHORITY. ON THIS DATE 6th DAY OF October 2002.

WITNESSES:

#1512

#354

2

## Declaration

I, Alfredo Holguin, does now attest that the foregoing documents and information are true and correct and are thusly sworn to under penalty of perjury to their validity. (T.C.P. & R. §132.001-231.003 and 28 U.S.C. §1746).

X _____

Alfredo Holguin, Pro Se


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing and included documents have been properly served upon the parties listed below at their respective addresses, as well as delivered to this Court. The Documents were placed in the Wm. G. McConnell Unit mailbox with first class, pre-paid postage affixed, addressed to the Court of Criminal Appeals, c/o Clerk of the Court, Able Acosta, at 201 W. 14th St., P.O. Box 12308, Supreme Court Bldg., Capitol Station, Austin, Texas 78711-2308.


Executed on this the 22nd day of December, 2014.
(T.R.A.P. Rule 9.5, F.R.A.P. Rule 25(d)).


Deemed filed Warner v. Glass 135 S.W.3d 681, 682 (Tex. 2004).

X _____

Alfredo Holguin, Pro Se


also served:

El Paso County District Attorney
203 El Paso Co. Courthouse
500 E. San Antonio
El Paso, Texas 79901
915.546.2059 (ph.)
915.533.5520 (fax)

and;

State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711-3046